B. I. LEWIS, ADMINISTRATOR, *v.* DR. S. F. CASENBURG.*

(*Knoxville,* September Term, 1927.)

Opinion filed July 2, 1928.

## 1. RES IPSA LOQUITUR.

The doctrine of **res ipsa loquitur** asserts that whenever a thing which produced an injury is shown to have been under the control and management of the defendant, and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised, the fact of injury itself will be deemed to afford sufficient evidence to support a recovery in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care. (Post, p. 189.)

Citing: 20 R. C. L., 187.

## 2. PERSONAL INJURIES. X-RAY INJURY. RES IPSA LOQUITUR. APPLICATION.

In a suit brought to recover for personal injuries inflicted from an X-ray burn, the machine that produced the injury was under the management and control of the defendant, and where it appears that the occurrence was such, as in the ordinary course of events, does not happen if due care had been exercised; that the defendant had given plaintiff's intestate one hundred sixty-one X-ray treatments, scattered over a period of six years, and the burn complained of was produced by the last treatment, the doctrine of **res ipsa loquitur** applies. (Post, p. 190.)

Citing: Shockley v. Turner, 126 Iowa, 456; Jones v. Tri-State Telephone & Telegraph Co. (Minn.), 40 L. R. A. (N. S.), 485; George v. Shannon (Kan.), Ann. Cas., 1916B, 338; Evans v. Clapp (Mo.), 231 S. W., 79; Hamilton v. Harris (Tex.), 223 S. W., 533; Johnson v. Marshall, 241 Ill. App., 80.

3. PERSONAL INJURIES. X-RAY BURNS. NEGLIGENCE. RES IPSA LOQUITUR. IDIOSYNCRASY. EVIDENCE. BURDEN OF PROOF.

In a suit for personal injuries, resulting from an X-ray burn where it appears that the defendant had given the plaintiff's intestate one hundred sixty-one treatments scattered over a period of six years, the burn complained of was caused by the last treatment; that true idiosyncrasy, that is, that one patient is more susceptible to a burn than another under similar circumstances; that just because a patient has stood a certain amount of X-ray theraphy on previous occasions is no criterion by which a doctor can be guided as to further treatments; that the defendant did not uncover and examine the area to be treated on the occasion that the burn was inflicted; that the burn complained of was a third degree burn (which is classed as the most serious), makes out a **prima-facie** case of negligence. (Post, p. 192.)

4. PERSONAL INJURIES. NEGLIGENCE. BURDEN OF PROOF. CHARGE TO JURY.

Where the testimony was gone into fully tending to charge the defendant with negligence, as well as attempting to exculpate him from liability, the evidence is sufficient to justify a submission to the jury, but the burden is upon the plaintiff to show negligence and the jury should be so charged. (Post, p. 196.)

5. RES IPSA LOQUITUR. BURDEN OF PROOF.

In a case where the rule of **res ipsa loquitur** applies it does not have the effect of shifting the burden of proof; but evidence of the occurrence of the injury is evidential of negligence on defendant's part, so as to make it incumbent upon him to present his proof, but does not make it necessary for him to prove by a preponderance of the evidence that there was an absence of negligence on his part. (Post, p. 196.)

---

*Headnotes 1. Negligence, 29 Cyc., p. 591; 2. Physicians and Surgeons, 30 Cyc., p. 1584; 3. ———; 4. Physicians and Surgeons, 30 Cyc., p. 1588.

---

FROM KNOX.

---

Appeal from the Circuit Court of Knox County.—HON. A. C. GRIMM, Judge.

KRAMER & KRAMER, for plaintiff in error.

LEE, PRICE, McDERMOTT & MEEK, HUGH M. TATE and CATES, SMITH, TATE & LONG, for defendant in error.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

By this suit the plaintiff sought to recover damages resulting from an X-ray burn inflicted upon his intestate, Mrs. Lewis.

The defense interposed was the idiosyncrasy or super-sensitiveness of the patient to the X-ray.

From the authorities it appears that this is about the only defense available in such case.

By idiosyncrasy it is meant that one patient is more susceptible to a burn than some other patient under similar conditions; a departure from normal.

The trial court, at the conclusion of all the evidence, sustained a motion by the defendant for a directed verdict.

Upon appeal the Court of Appeals reversed the case and remanded it for a new trial, being of the opinion that under the doctrine of *res ipsa loquitur* there was sufficient evidence to take the case to the jury.

In 20 R. C. L., 187, it is said:

*(1)* "More precisely the doctrine *res ipsa loquitur* asserts that whenever a thing which produced an injury is shown to have been under the control and management of the defendant, and the occurrence is such as in the ordinary course of events does not happen if due care

has been exercised, the fact of injury itself will be deemed to afford sufficient evidence to support a recovery in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care.''

*(2)* In the case under consideration the machine that produced the injury was under the management and control of the defendant, and the occurrence was such, as in the ordinary course of events, does not happen if due care had been exercised. In this particular case the defendant gave the plaintiff's intestate one hundred and sixty-one X-ray treatments scattered over a period of six years, and the burn was produced by the last treatment. Tested by the above definition, it would seem that the doctrine of *res ipsa loquitur* applies in a case of this character. The decisions, however, upon the question are in much conflict.

The following cases support the rule: *Shockley* v. *Turner*, 127 Iowa, 456; *Jones* v. *Tri-State Teleph. & Teleg. Co.* (Minn.), 40 L. R. A. (N. S.), 485; *George* v. *Shannon* (Kan.), Ann. Cas., 1916B, 338; *Evans* v. *Clapp* (Mo.), 231 S. W., 79; *Hamilton* v. *Harris* (Tex.), 223 S. W., 533; *Johnson* v. *Marshall*, 241 Ill. App., 80.

In *Jones* v. *Tri-State Teleph. & Teleg. Co., supra,* the court said:

''The instrumentality was under the exclusive control of defendant, and there is sufficient evidence that injury to the subject is not a necessary result of the taking of an X-ray picture, if proper instrumentalities and proper care are used. Certainly we cannot say that plaintiff's injuries were not the result of exposure. These facts are enough to make the case one of *res ipsa loquitur.''*

In *Evans* v. *Clapp, supra,* it was said:

"X-ray examinations, when carefully and properly made, do not produce burns; hence when a burn is produced, this fact is of itself some evidence from which the jury may find that the degree of care and skill ordinarily exercised by persons of like profession and using such agencies was not exercised in that particular case."

Decisions to the contrary are as follows: *Runyan* v. *Coodrum* (Ark.), 13 A. L. R., 1403; *Stemons* v. *Turner* (Pa.), 26 A. L. R., 727; *Streett* v. *Hodgson,* 139 Md., 137; *Sweeney* v. *Erving* (D. C.), 43 L. R. A. (N. S.), 734; *Hunter* v. *Burroughs,* 123 Va., 113; *McCoy* v. *Buck* (Ind. App.), 157 N. E., 456.

The reason generally assigned for rejecting the doctrine in such a case is that it does not take into account the idiosyncrasy of the patient who is occasionally responsible for the burn.

The intestate of plaintiff received what is termed a third degree burn of her abdomen. It covered a space of seven by nine inches, and the flesh sloughed off practically to the lining of the intestine.

Dr. Hedge, a Reontgenologist of wide experience, and who, at the time of testifying in this suit, was at the head of the Department of Dermatology of two large Chicago hospitals, and an assistant in the same department of two other hospitals in that city, examined plaintiff's intestate some months after her burn. He states that there is no justification for causing an X-ray burn of this type; that this burn occurred in a locality which is less likely to be burned than other places on the body.

With respect to the degree of burns, he testified as follows:

"Q. Doctor, are there in the treatment and use of X-ray machines—are there different degrees of X-ray burns? A. Yes, there are.

"Q. How many different degrees are there of X-ray burns? A. Well, as is the case with all burns, we generally consider there are three types—first degree, second degree and third degree burns.

"Q. What is a first degree burn? A. A first degree burn is very frequently one in which there is an erythema, or redness of the skin produced by an erythema.

"Q. You mean an irritation only of the skin? A. Yes.

"Q. What is a second degree burn? A. A second degree burn is one in which there is an erythema which is followed by vesiculation.

"Q. And what is vesiculation? A. Vesiculation is various size blisters or blisters of various size over the area exposed.

"Q. Now, what is a third degree burn? A. A third degree burn is one in which the tissues under the area exposed is covered not only as the erythema and covered by the vesiculation or blisters but after a period of time sloughs away passing down into the deeper tissues and sometimes through the muscles and even as deep as the bone."

Practically all of the experts introduced on the trial of this case testified that idiosyncracy usually manifests itself after the first treatment; occasionally after the second, but none of these witnesses had even seen a case after the third treatment, from which the conclusion seems inevitable that the burn complained of could not have resulted from an idiosyncrasy.

The Court of Appeals, in its opinion, said:

(3) "The expert testimony in this case shows a strong and increasing tendency among the most able reontgenologists to eliminate the idea of idiosyncrasy as accounting for X-ray burns. This can mean only one

thing, that there is more room to apply the idea of idiosyncrasy to the operator of the machine than to the patient. But aside from this proof, the established facts of this case eliminate the element of idiosyncrasy and this gives, as applicable to this case, a great preponderance to the authorities in favor of applying the rule of *res ipsa loquitur*."

MacKee, a recognized authority, who wrote a book entitled "X-rays and Radium Treatment," with respect to the rarity of true idiosyncrasy, says:

"To prove the rarity of true idiosyncrasy one has but to review the history of the X-ray treatment of tinea tonsurans. In the roentgen laboratory of the Department of Dermatology and Syphilology, Medical Department, Columbia University, over a thousand cases of ringworm of the scalp have been irradicated without a single instance of idiosyncrasy being encountered."

These matters are explained rather fully by Dr. Harry M. Hedge, and his views do not seem to be particularly controverted; hence we will quote rather copiously from his testimony. Before doing so, however, attention is called to the fact that there is testimony that the defendant did not uncover and examine the area to be treated on the occasion that the burn was inflicted. Dr. Hedge testified as follows:

"Q. Is the fact that a patient takes a certain strength or a certain amount of X-ray force for several treatments, is there any question that the same dose will not be dangerous as affecting the burns if given again? A. X-ray dosage is cumulative and the patient must be under constant observation of an experienced therapeutist to be able to determine how to X-ray. Just because a patient has stood a certain amount of X-ray therapy on previous

occasions is no criterion by which the doctor can be guided as to future treatments—he must continually use his own judgment as to what is best and the amount of therapy to be given at that particular time.

.  .  .  .  .  .  .

"Q. And does a person exposed to X-ray treatment continually or frequently, the X-ray treatment being over a long period of time, require constant or frequent examination in order to detect and tell the effect of the dosage on that person? A. The area to be exposed ought always to be examined before exposure is given.

"Q. Is that before every exposure is given? A. Yes.

"Q. For safety? A. Yes.

.  .  .  .  .  .  .

"Q. Suppose, doctor, that a person had been given one hundred and sixty, take their figures, X-ray treatments, without any burns, and that after the one hundred and sixty X-ray treatments covering six years had been given, another treatment was given and that following that treatment in ten or twelve days after it was given redness or an erythema appears and following that erythema redness spreads over the abdomen until it covers an area of about seven by nine inches, it turns black and it forms little blisters and it sloughs off and following that it has an odor of decomposed or burned flesh and it finally forms a hardened crust across it and that crust sloughs off until it finally leaves exposed the condition you saw and described to the jury—I will ask you to say what that would indicate? A. It would indicate one or two things—that before the last exposure was given that there was a definite indication upon the surface of the skin which even to the semi-trained eye would indicate that he was treading on dangerous ground or, second,

that there was some mistake of the technic—or some error of judgment in giving the amount of the exposure that was given at that time, which was sufficient in itself to cause an X-ray burn of the severity as described.''

In explaining the progress of X-ray therapy, this witness further testified as follows:

''A. When I began my X-ray work, X-ray work was used with an old gas bellows placed on the end of the X-ray to determine the amount of light that was had from the tube, that your lens might be correct, because we gave our exposures upon our judgment—we then thought 30 or 45 or 125 would be about the right exposures—about the right exposure. We developed erythema then, but when MacKee came out with his formulas and his filter and the positive amount of kilowatts that are used or milamperes used and the length of exposure, and all those things, made it an exact science, and when a man under those conditions produces an X-ray burn there is one of two things—a mistake has happened. The accumulative effect must have been there and evident upon examination or else the figure was in error and the proper amount of dosage was not given—there is no other way out of it—I do not have to explain it—there is no other way out of it.

. . . . . . .

''Q. You were not there when this X-ray treatment was given? A. No. I know this, that I have seen hundreds of cases and that every case that there is either an evidence of accumulative effect of the X-ray, or else on the other hand, as I have already stated, there is an excessive amount of X-ray given at that particular date, but there is but very little stress placed on idiosyncrasies as MacKee says—it is exceedingly rare—even MacKee

says that he does not know whether it exists. There are slight idiosyncrasies where you get a little erythema, but you do not get a grave erythema or grave instances of burn, except on these two X-ray principles I have stated, and I will challenge any X-ray man to change my statement on that."

From the testimony in this case we are led to believe that under modern conditions a third degree burn is indicative of negligence, and makes out a *prima-facie* case against the operator of the machine. There are also other circumstances of negligence.

(4) But where, as here, the testimony was gone into fully tending to charge defendant with negligence, as well as attempting to exculpate him from liability, the burden is still upon the plaintiff to show negligence on the part of the defendant.

Our conclusion is, therefore, that the evidence is sufficient to justify a submission of the case to the jury, and they should be instructed that the burden is upon the plaintiff to show negligence.

In *Sweeney* v. *Erving*, 228 U. S., 233, Ann. Cas., 1914D, 907, the court, speaking through Mr. Justice PITNEY, said:

(5) "In the view we take of the matter, it is not necessary to pass upon the question whether the evidence presented a case for the application of the rule *res ipsa loquitur;* for the reason that in cases where that rule does apply, it has not the effect of shifting the burden of proof.

"The general rule in actions of negligence is that the mere proof of an 'accident' (using the word in the loose and popular sense) does not raise any presumption of negligence; but in the application of this rule, it is recognized that there is a class of cases where the circum-

stances of the occurrence that has caused the injury are of a character to give ground for a reasonable inference that if due care had been employed, by the party charged with care in the premises, the thing that happened amiss would not have happened. In such cases it is said, *res ipsa loquitur*—the thing speaks for itself; that is to say, if there is nothing to explain or rebut the inference that arises from the way in which the thing happened, it may fairly be found to have been occasioned by negligence . . .

"In our opinion, *res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. *Res ipsa loquitur,* where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is, whether the preponderance is with the plaintiff."

Following this opinion, the annotator says:

"The reported case affirms what has now come to be the prevailing view with reference to the rule of *res ipsa loquitur,* viz., that that rule does not relieve the plaintiff of the burden of showing negligence. In cases where the rule is applicable evidence of the occurrence of the injury is evidential of negligence on defendant's part, so as to make it incumbent on him to present his proofs; but it does not make it necessary for him to prove by a preponderance of the evidence that there was an

absence of negligence on his part. The burden of proof has not shifted. It still remains with the plaintiff. And if on the whole case the plaintiff has not shown by a preponderance of the evidence that his injuries were caused by the negligence of the defendant he is not entitled to a verdict."

The above quotation from *Sweeney* v. *Erving,* has been approved by this court in *North Memphis Savings Bank* v. *Union Bridge & Construction Co.,* 138 Tenn., 188.

Being of the opinion that the Court of Appeals was correct in reversing and remanding this case for a new trial, it results that the petition for writ of *certiorari* will be denied.