POOR SISTERS OF ST. FRANCIS *et al. v.* LONG *et al.*

(*Jackson,* April Term, 1950.)

Opinion filed May 1, 1950.

Rehearing denied June 9, 1950.

436

EMMETT W. BRADEN, W. P. ARMSTRONG, JR., (ARMSTRONG, MCCADDEN, ALLEN, BRADEN & GOODMAN of counsel) and ALBERT F. JOHNS, all of Memphis, for plaintiff in error.

JOHN S. PORTER and BAILEY BROWN, both of Memphis, for defendants in error.

Mr. Chief Justice Neil delivered the opinion of the Court.

The defendants in error brought separate suits in the Circuit Court of Shelby County to recover damages for personal injuries alleged to have been received by Mrs. Long while she was a patient in St. Joseph's Hospital which was being operated by Poor Sisters of St. Francis, Seraph of the Perpetual Adoration. The injuries complained of by Mrs. Long consisted of a compression of the eighth thoracic vertebra and a comminuted fracture of the humerus in the region of the left shoulder. She was in the hospital for the purpose of giving birth to her baby, Dr. J. R. Reinberger being her attending physician. The husband H. M. Long, sued to recover for loss of services of his wife and for medical and hospital expenses. The declaration in each case alleged:

"That injuries such as the plaintiff sustained are not incidental to and do not usually and customarily attend the birth of a child and plaintiff charges that she would not have sustained such injuries had the defendants been in the exercise of reasonable and ordinary care; that when said injuries were inflicted upon her she was unconscious and is unable to state the cause thereof, but specifically charges that at all times she was under the joint care of the defendants herein named and in that

situation she specifically relies upon the doctrine of *res ipsa loquitur;*[1]

\* \* \* \* \* \*

"That plaintiff's pregnancy terminated in the birth of her baby, who was in excellent health and the plaintiff herself, prior to entering the hospital, enjoyed excellent health; that under these circumstances plaintiff charges that the burden is upon these defendants to explain the manner in which said severe traumatic injuries and illness were caused while she was unconscious and under the joint exclusive care and custody of these defendants who held themselves out as specialists in the treatment and hospitalization of maternity cases and who undertook the treatment and hospitalization of the plaintiff for a consideration at the time and place heretofore alleged;"

The defendants pleaded the general issue of not guilty. In response to the plaintiffs' motion that defendants be required to state their defense by special plea they pleaded as follows:

"That defendants deny the allegations of the ninth grammatical paragraph of Count I of the said declaration, and on the contrary affirmatively allege that while

---

1.                     *Res Ipsa Loquitur*

"The general rule in actions of negligence is that the mere proof of an 'accident' (using the word in the loose and popular sense) does not raise any presumption of negligence; but, in the application of this rule, it is recognized that there is a class of cases where the circumstances of the occurrence that has caused the injury are of a character to give ground for a reasonable inference that if due care had been employed, by the party charged with care in the premises, the thing that happened amiss would not have happened. In such cases it is said, *res ipsa loquitur*—the thing speaks for itself; that is to say, if there is nothing to explain or rebut the inference that arises from the way in which the thing happened, it may fairly be found to have been occasioned by negligence. \* \* \*." Lewis v. Casenburg, 157 Tenn. 196, 197, 7 S. W. 2d 808, 811, 60 A.L.R. 254.

the injuries from which plaintiff, Mrs. Gertrude Long, suffered, if any, are not the normal accompaniment of childbirth, that infection and injury of this type are not infrequent as a result of childbirth, and can and do frequently occur as a result thereof, and without any symptoms which could, or, in the exercise of ordinary care, should indicate their presence to the attending physician, and that they can and do frequently occur without any negligence on his part, or on the part of the hospital in which the patient is treated, and, therefore, defendants specifically deny that this is a case in which the doctrine of *res ipsa loquitur* would apply.''

The defendants denied that the burden was upon them to ''explain the manner in which the injuries and illness of plaintiff, Mrs. Gertrude Long, were caused, but on the contrary the burden rested upon her to show that her injuries were the result of some negligence on the part of one or more of the defendants''.

The two cases were tried by a jury, the plaintiffs resting their right to recover solely upon the ground of *res ipsa loquitur*.

At the conclusion of the plaintiffs' proof the defendants moved the court for peremptory instructions upon the ground that there was no evidence of negligence and the rule of *res ipsa loquitur* did not apply. It was overruled. The motion was renewed at the conclusion of all the evidence and the trial judge again overruled it, to which action an exception was taken. There was a verdict for the plaintiffs. A motion for a new trial was seasonably made and overruled and an appeal prayed and granted to the Court of Appeals. That court affirmed the judgment of the trial court, and we granted certiorari. The errors complained of have been argued,

440

and elaborate briefs filed by counsel for each of the parties.

The assignments of error, severally and collectively, raise but one question, i. e. the applicability of the doctrine *res ipsa loquitur* to the facts of the case.

There appears to be a difference of opinion between counsel as to whether or not this is a malpractice case. Whether or not it is such a case in a strict legal sense we think it is in the nature of an action based upon alleged malpractice.

■■ By the weight of authority the application of the doctrine *res ipsa loquitur* is limited in medical cases. It seems to be the general rule in actions for malpractice, "that there is no presumption of negligence from the mere failure of judgment on the part of a doctor in the diagnosis or in the treatment he has prescribed, or from the fact that he has been unsuccessful in effecting a remedy, or has failed to bring about as good a result as someone else might have accomplished, or even from the fact that aggravation follows his treatment.'' Shain on Res Ipsa Loquitur, p. 467; *Nelson* v. *Dahl,* 1928, 174 Minn. 574, 219 N. W. 941; *Inglis* v. *Morton,* 1918, 99 Wash. 570, 169 P. 962; *Ewing* v. *Goode,* C. C. Ohio 1897, 78 F. 442, 443. In support of the text the author refers to the following statement by Chief Justice Taft in *Ewing* v. *Goode, supra.* (He was then U. S. Circuit Judge.) "A physician is not a warrantor of cures. If the maxim, '*Res ipsa loquitur,*' were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the ills that flesh is heir to.' '' .

There are many decisions in which the courts have held that an inference of negligence should not be indulged where the alleged wrongful treatment by a physician or surgeon involves a scientific exposition of the question by expert testimony. *Laughlin* v. *Christensen,* 8 Cir., 1 F. (2d) 215; *Chubb* v. *Holmes,* 1930, 111 Conn. 482, 150 A. 516; *Robbins* v. *Nathan,* 1919, 189 App. Div. 827, 179 N. Y. S. 281. In our own case of *Quinley* v. *Cocke,* 183 Tenn. 428, 192 S. W. (2d) 992, 996, it was held that the rule will not apply in malpractice cases "where a scientific exposition of the subject matter is essential", citing Shain, supra, and cases. At the same time we recognized an exception to the rule, as where an unusual injury occurs, *Meyer* v. *McNutt Hospital,* 173 Cal. 156, 159 P. 436. In the latter case the plaintiff awoke from an anesthetic with her leg burned. In *Evans* v. *Roberts,* 172 Iowa 653, 154 N. W. 923, a piece of the patient's tongue was cut off in an operation for adenoids. The rule was properly applied in the case of *Meadows* v. *Patterson,* 21 Tenn. App. 283, 109 S. W. (2d) 417 where, following an operation for appendicitis, the patient's eye was cut, resulting in the loss of sight. Also in *Lewis* v. *Casenburg,* 157 Tenn. 187, 7 S. W. (2d) 808, 809, 60 A. L. R. 254, the patient received what is termed a third degree burn of her abdomen. "It covered a space of 7 by 9 inches and the flesh sloughed off practically to the lining of the intestine." But even in this class of cases the Court cited a number of decisions to the contrary.

We think the plaintiff's declaration states a cause of action falling within the doctrine *res ipsa loquitur,* in alleging that she was within the exclusive care of the hospital and her attending physician and at a time when she was unconscious, following the birth of

her child, she received the serious bodily injuries complained of. *Meadows* v. *Patterson, supra; Lewis* v. *Casenburg, supra; Ybarra* v. *Spangard,* 1944, 25 Cal. (2d) 486, 154 P. (2d) 687, 162 A. L. R. 1258; *Whetstine* v. *Moravec,* 228 Iowa 352, 291 N. W. 425; *Johnson* v. *Ely,* 30 Tenn. App. 294, 205 S. W. (2d) 759.

In all malpractice cases where the rule *res ipsa loquitur* is held to be applicable the jury may infer negligence in the absence of a reasonable and satisfactory explanation as to how the accident occurred. In other words the plaintiff would be entitled to go to the jury upon the inference of negligence unless the defendant offered some explanation of the injury which reasonable minds must agree destroyed the probative force of the circumstances which, as a matter of law, created a presumption of negligence.

Considering the right of the defendant to a directed verdict in a case of this kind, we find quite a diversity of opinion, the majority apparently holding that the *res ipsa loquitur* rule is nothing more than "one form of circumstantial evidence". "A minority of the courts, however, have given *res ipsa loquitur* a greater effect than that of a mere permissible inference from the evidence. They have held that it creates a presumption, which always requires a directed verdict for the plaintiff if the defendant offers no evidence to meet it." Prosser on Torts, pp. 303, 304.

In discussing the unending controversy as to whether or not the naked presumption of law may be weighed as evidence against the evidence of the defendant, Professor Prosser says: (20 Minn. Law Rev. 241, 265, 266) "It seems clear that a permissible inference is always evidence, has weight as evidence, and remains to be consid-

ered by the jury as long as it may reasonably be drawn from all the facts presented. *This is merely to say that circumstantial evidence is entitled to consideration so long as reasonable men might base a conclusion on it.*" (Emphasis supplied).

This Court seems to be committed in principle to the Prosser view, that the facts of the occurrence warrant the inference of negligence, but "do not compel such an inference"—"that they call for explanation or rebuttal, not necessarily that they require it." *Lewis* v. *Casenburg, supra.*

The rule has been spoken of in many decisions as a rule of necessity, that the facts and circumstances attending the injury, or the very nature of the injury, testify for the plaintiff and justify an inference of negligence "The thing itself speaks." But the circumstances, often relied upon to sustain a verdict for the jury, may not speak much above a whisper. Whereas in another case, such as *Lewis* v. *Casenburg,* they may speak in thunderous tones. However, in all such cases the question of negligence is one for the court where the evidence explaining the cause of the injury is so strong that reasonable minds could draw but one conclusion therefrom.

In 38 Am. Jur., p. 995, it is said: "Where all the facts attending the injury are disclosed by the evidence, and nothing is left to inference, no presumption or inference can be indulged, and the doctrine of *res ipsa loquitur* has no application." In support of the foregoing text the author cites decisions from as many as ten jurisdictions.

Applying the law to the facts of the case at bar we think the trial judge was in error in not directing a

verdict for the defendants. This conclusion necessarily requires a discussion of the facts. Briefly stated the plaintiff contends that the injuries she sustained while in St. Joseph's Hospital, and while she was unconscious, resulted from trauma. The defendants say that this is not true, but that on the contrary they resulted from convulsions caused by a rare disease known as eclampsia which is found only in pregnant women and that Mrs. Long had this disease.

There is no evidence that Mrs. Long sustained a fall, or otherwise received a traumatic injury at any time while at the hospital. She very frankly testified that she did not know how or under what circumstances she was injured. However, there is but one theory which could possibly be advanced, that is that she was allowed to fall from a bed or operating table while a patient in the hospital.

She was admitted to the hospital at 8:30 o'clock in the morning. She was in active labor and was given sedatives, such as demerol, to relieve pain. It is important to note that from the time of her admission until 1:45 o'clock she occupied a "labor bed". This labor bed was built like a child's crib, in that the sides of the bed were two feet above the mattress which was to prevent an occupant from falling out. According to the testimony of Sister Eldegundis, who is a trained nurse and Supervisor of Obstetrics, she was not left alone longer than five minutes at a time before she was taken to the delivery room. She says: "A patient in active labor is watched constantly". There is other proof that "the sides to the bed were up". Dr. Redmon, an assistant to the defendant, Dr. Reinberger, testified he was constantly with her until approximately one o'clock,

when he returned to his office. Thus it appears that up to the time she was taken to the delivery room she had sustained no accident of any kind. She did not fall out of the labor bed.

Sister Eldegundis further testified that "Patients are not left alone in the delivery room at any time." While on the delivery table Mrs. Long was restrained by means of "arm straps" and "leg straps" and hence could not have fallen from the table. Sister Eldegundis helped, following the delivery of her baby to transfer her from the table to her room in the hospital. This was between four and five o'clock. Dr. Reinberger remained with her for an hour after the baby came at 2:10 P. M. Dr. Baker, an intern, was present during and after the delivery of the child. She had not fallen from the delivery table because she was strapped to it, and did not fall while being taken to her room on the hospital carriage.

Shortly after being transferred to her room Mrs. Long had two convulsions, about five minutes apart. Her mother, Mrs. Gertrude Eilbott, and Sister Eldegundis both were present and witnessed these convulsions, the latter testified, "She was violent in the sense that she threshed about with arms and legs." Mrs. Eilbott did not think they were so violent but she was alarmed and had the doctor called. She was held in her bed by the Sister and one of the girls, just enough to keep her from falling out of bed. Her mother remained with her constantly throughout the night. She was asked:

"Q. Did she fall out of bed or anything like that during the convulsion? A. No.

"Q. Did anything unusual happen during the night? Did she fall out of bed or anything untoward result or happen? A. No. They gave her something all through the night to make her sleep."

Several hours following these convulsions Mrs. Long complained of her arm and back hurting her. An X-ray picture was taken disclosing the fractures heretofore referred to. All of the foregoing facts are conclusively shown by unimpeached testimony. There is nothing to the contrary. We do not see how it would be possible for reasonable minds to conclude that the plaintiff's injuries resulted from trauma, such as falling from a bed or operating table.

At the time Dr. Redmon testified in the case he had no connection with the hospital or with Dr. Reinberger. He was called as a witness by and on behalf of the plaintiffs. No question is made as to his professional ability or integrity. He stated that Mrs. Long's convulsions resulted from "eclampsia", which is a toxic condition appearing in pregnant women. He was not present at the time of the delivery, but saw the second convulsion and said, "It was a typical obstetrical eclamptic convulsion." In answer to a question as to the cause of the fractures in Mrs. Long's spine and arm, propounded by the plaintiff's counsel, he said: "In my opinion the fractures must have resulted from the convulsions." He further stated that "fractures do occur in convulsions whether it is eclampsia or shock treatment". Dr. Meyer a specialist in orthopedic surgery, also was a witness for the plaintiff, he having treated her for her fractures. He gave it as his opinion that it was possible to have a fracture from a convulsion, and "there was nothing a doctor could do to prevent a fracture during a convulsion"; that fractures could have been caused from falling from a bed or "using too much restraint when she was having a convulsion". "Fractures occur sometimes by a patient turning over in bed and without any excessive or quick movement."

█ The plaintiffs seek to minimize the explanation that the fractures resulted from *eclampsia* because of the rarity of the disease, there being only a few reported cases among several thousand. The Court of Appeals thought that it had little probative value, so much so that it amounted to no explanation at all. But we cannot so easily brush it aside. While eclamptic convulsions may be extremely rare in the history of medical science, the fact that it exists and is recognized by competent medical experts, fully justifies its consideration as having some probative value. The courts will not reject proof of a fact, or appraise it as having little or no probative value merely because it is only known to a few men of science, or that it seldom occurs in a field where only trained specialists are able to detect it.

█ Contention is made by the plaintiffs that the failure of the defendants to take the deposition of a Miss Walker, or otherwise use her as a witness, is a circumstance against them; that she was one of Mrs. Long's nurses and was under the control of the defendants. This contention is without merit. The record conclusively shows that Miss Walker had been in New Orleans, La., for some time prior to and at the time of the trial. This being the case she was not under the control of the defendants. Since she was beyond the jurisdiction of the court, it was not possible to compel her attendance as a witness. There is not even a suggestion that she was induced to leave the State to prevent plaintiffs' using her as a witness.

The assignments of error are sustained, and the case reversed and dismissed.

BURNETT, GAILOR and TOMLINSON, JJ., concur.

PREWITT, J., not participating.

## On Petition to Rehear.

The plaintiffs in the trial court, appellees here, have petitioned the Court for a rehearing and for an affirmance of the Court of Appeals, complaining (1) that the Court erroneously assumed that eclampsia is a rare and infrequent disease, (2) that the Court erroneously assumed that the fact that fractures were practically unheard of was consistent with the opinion of defendants that the fractures here resulted from eclampsia. The major premise being unwarranted results in the conclusion being erroneous. (3) The Court gave no consideration to what occurred in the delivery room and the failure of defendants to offer an explanation. (4) The Court assumed as a matter of law and without evidence that the unconscious plaintiff suffered no accident while alone with nurses in the labor and delivery room. (5) That there was abundant proof that the defendants were guilty of negligence in permitting the patient to suffer from eclampsia by negligently failing to notice symptoms then existing which were known to the defendants to be "danger signals."

Responding to assignment (1) the statement by the Court that "eclampsia is a rare disease", if erroneous, does not go to the merits of the case. There is evidence in the record that it is infrequent, Dr. Redmon testifying as to the frequency of eclampsia in child birth in cases under his personal observation the percentage was "one or two per cent". He attended approximately 100 cases during the previous year and none of these patients suffered from eclampsia. He testified further, however, that "it isn't an infrequent occurrence especially in the South." Dr. Reinberger gave it as his opinion that

*fractures* resulting from eclampsia were very rare, ''may be 9'', in all medical literature.

Our expression in the original opinion that ''eclampsia was a rare disease'' was used in the sense that a convulsion resulting therefrom was so rare that there was no legal duty devolving upon the defendants to anticipate it and guard against it. In this connection we respond to the last assignment (No. 5) that defendants were negligent in their diagnosis, and in failing to notice symptoms which gave warning of ''danger signals.'' The evidence shows without dispute that the defendants could have done nothing to prevent convulsions resulting from eclampsia or any other cause. By the overwhelming weight of authority (and we need not cite cases) negligence in the matter of diagnosis by a physician is not an actionable wrong for which the patient may recover damages. Moreover it is not a ground for a rehearing in the instant case because it was not made an issue in the trial court. In the plaintiff's declaration there was no allegation of any specific act of negligence, the sole question being whether or not the plaintiff was entitled to recovery under the doctrine of *res ipsa loquitur.*

Passing to contentions (3) and (4) that the Court gave no consideration to what transpired in the delivery room, that defendants' failure to prove by attending nurses that Mrs. Long did not fall from the table etc. Counsel are entirely mistaken as to that. The uncontradicted evidence is that Mrs. Long was strapped to the delivery table. No reason is given, and none can be reasonably conceived, why she should have been unstrapped prior to being taken to her room on the hospital carriage. In the original opinion we quoted the

testimony of Sister Eldegundis to the effect that Mrs. Long was constantly watched by attendants. She testified, and we quote from the original opinion, as follows: "A patient in active labor is watched constantly." Again she stated "Patients are not left alone in the delivery room at any time." It thus appears that we gave full consideration to what took place in the delivery room, also at times prior thereto and afterwards.

Should there be a presumption that Mrs. Long fell from the table or bed as a result of negligence? We think not. No such presumption could be indulged where there was positive and unimpeachable evidence to the contrary. We refer to the testimony of Sister Eldegundis quoted above and also to the evidence of Dr. Alphonse Myer, petitioner's witness, to the effect that fractures could result from convulsions and "there was nothing a doctor could do to prevent it", and a fracture could happen "by a patient turning over in bed". There is no evidence to the contrary.

The petition to rehear is denied.