223 So.2d 148 (1969)
254 La. 204
Mrs. Monty TYLER, wife of John F. GRANT
v.
TOURO INFIRMARY, New Amsterdam Casualty Company and Hardware Mutual Casualty Company (two cases).
Nos. 49185, 49201.
Supreme Court of Louisiana.
May 5, 1969.
Rehearings Denied June 9, 1969.
*149 Robert E. Leake, Jr., of Hammett, Leake & Hammett, Frank J. D'Amico, New Orleans, for defendant-applicant.
Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, Carl J. Schumacher, Jr., David L. Campbell, Dando B. Cellini, Walter M. Barnett, Moise S. Steeg, Jr., Morris Wright, Stephen B. Lemann, Leonard B. Levy, New Orleans, for defendants-respondents.

CONSOLIDATED
McCALEB, Justice.
Mrs. Monty Tyler Grant underwent abdominal surgery at Touro Infirmary in New Orleans on January 2, 1962. A gauze sponge was left in Mrs. Grant which was surgically removed on August 31, 1962. Mr. and Mrs. Grant then filed this suit for damages against Touro Infirmary and its insurer, Hardware Mutual Casualty Company (hereinafter referred to as Hardware), and also against New Amsterdam Casualty Company (hereinafter referred to as Amsterdam), the liability insurer of the operating surgeon, Dr. Abe Golden, who was not joined as a party-defendant.
Hardware denied the policy it issued to Touro Infirmary provided coverage for plaintiffs' claims and refused to defend Touro in the suit.
Touro answered, pleading that it is a charitable institution and, therefore, immune from liability in matters such as this. It also pleaded that Dr. Golden, a competent and qualified surgeon, had been in sole charge of the operation; and that, during the operation, its nurses, and all other hospital personnel assisting him, were under Dr. Golden's sole direction and became his servants and agents.
*150 Amsterdam admitted it had issued a liability policy to Dr. Golden but, denying any fault on his part and averring that he is highly competent, prayed for dismissal of the suit.
Hardware filed an exception of no cause of action and moved for a summary judgment, averring that the policy issued to Touro contained an exclusion of liability clause wherever claim was made based on a charge of fault in the rendering of medical, surgical or nursing services.[1]
Additionally, Touro filed third-party demands against Hardware and Amsterdam. The third-party demand against Hardware claimed, among other things, compensation for the costs, including attorney's fees, for its defense of the suit. Hardware filed third-party demands against Dr. Golden and his insurer, Amsterdam; and the latter filed third-party demands against Touro and Hardware.
The case was tried by a jury which returned a verdict in favor of plaintiffs against all defendants, Touro, Amsterdam and Hardware, in solido, in the sum of $18,000, and they appealed. The Court of Appeal, Fourth Circuit, (with one judge dissenting in part) reversed the judgment in favor of plaintiffs, insofar as it ran against Touro and Amsterdam and, insofar as it dismissed the third-party claim of Touro against Hardware. The judgment in plaintiffs' favor was affirmed against Hardware, and there was judgment in favor of Touro on its third-party demand against Hardware in the sum of $6,000. See Grant v. Touro Infirmary, La.App., 207 So.2d 235, 244.
Plaintiffs made application for certiorari, alleging that the verdict of the jury and judgment of the trial court was correct and that the Court of Appeal erred in reversing the judgment in part. Hardware also applied for certiorari, asserting that the Court of Appeal erred in holding (1) that it insured Touro against errors of the surgical nurses in carrying out the sponge counts as part of a surgical procedure; (2) that it erred in holding that Dr. Golden was not negligent in leaving a surgical sponge in Mrs. Grant's body; (3) that it erred in holding that Dr. Golden is not legally responsible for the improper sponge count by the surgical nurses; and (4) that it erred in awarding attorney's fees of $6,000 to Touro. Both applications were granted and the case has been argued and submitted for our decision.
Imprimis, we notice that plaintiffs and Amsterdam are complaining that the Court of Appeal erred in holding that Touro is a charitable, nonprofit institution and, hence, immune from liability for the negligence of its nursing personnel. Counsel for Amsterdam have devoted much space in their brief to this argument, insisting that the doctrine of charitable immunity has outlived its usefulness and that "the public policy considerations which motivated its creation have long since disappeared."
Although the record shows that the total income of Touro for the year 1962 far exceeded the actual cash value of the charitable services it rendered, there can be no doubt that Touro is a charitable institution within the legally accepted meaning of that term, as it is not operated to make profit but solely to heal the sick and relieve suffering without hope or purpose of getting gain from the services it dispenses.
Ever since 1854 when Touro was founded as a nonprofit corporation for charitable purposes it has operated as such throughout the succeeding years. Touro was recognized in 1922 as an eleemosynary hospital *151 entitled to assert the doctrine of charitable immunity in Jordan v. Touro Infirmary, La.App., 123 So. 726. Its status has not changed in any respect,[2] it being shown that it receives operating and capital funds from the United Fund, Jewish Welfare Fund, City of New Orleans, Federal Government, its medical staff and board of managers and private donations from the community at large. Mr. Walter M. Barnett, President of Touro in 1962, testified that the revenue secured from pay patients is devoted to the care of the indigent and part pay patients.
This Court has in the past inferentially, if not directly, by the refusal of certiorari, sanctioned the doctrine of charitable immunity from tort liability in many cases. See Thibodaux v. Sisters of Charity of Incarnate Word, 11 La.App. 423, 123 So. 466; Jordan v. Touro Infirmary, supra; Messina v. Societe Francaise de Bienfaissance, La.App., 170 So. 801; Jurjevich v. Hotel Dieu, La.App., 11 So.2d 632; D'Antoni v. Sara Mayo Hospital, La.App., 144 So.2d 643; Humphreys v. McComiskey, La. App., 159 So.2d 380; Danks v. Maher, La. App., 177 So.2d 412; and Hill v. Eye, Ear, Nose and Throat Hospital, La.App., 200 So. 2d 34.
While the doctrine of charitable immunity has been subjected to criticism in decisions of some states and also by legal text writers, we are not disposed at this time to alter the jurisprudence of our appellate courts on this subject, particularly in view of the fact that the doctrine, as approved by the appellate courts, is of a most restricted nature. It has been held to apply only to beneficiaries of the charity (which includes paying patients), but not to a third-party stranger (see Bougon v. Volunteers of America, 151 So. 797, La. App.Orl.1934); it does not apply when corporate negligence can be proven, that is, if it is shown that the institution was negligent in the selection of its employees (see authorities above cited and also 15 Am.Jur. 2d, Charities, Sec. 160, p. 171); and the immunity may not be urged as a defense by the liability insurer of the charity, such defense being personal to the charity itself (Idem).
In view of the above cited jurisprudence, which has been applied and reiterated by our appellate courts for many years, and considering the limited nature of the immunity granted, we are of the opinion that, if any change is to be effected in the law, it should be made by the legislative and not the judicial department.
The primary complaint of Hardware is that the Court of Appeal erred in concluding that its policy insured Touro against errors by surgical nurses in carrying out sponge counts as part of a surgical procedure. In support of this contention, Hardware's counsel point to an endorsement contained in its general liability policy, denominated "EXCLUSION OF MALPRACTICE AND PROFESSIONAL SERVICES", providing in part that the policy does not apply to injury, et cetera, due to:
"A. The Rendering Of Or Failure To Render
1) Medical, surgical * * * or nursing service or treatment; * * *
2) Any service or treatment conducive to health or of a professional nature; * * *

*152 B. The Furnishing Or Dispensing Of * * * Surgical Supplies Or Appliances; * * *"
Counsel contend that the making of sponge counts before and during an operation is a service of a professional nature, the rendition of nursing services and the furnishing or dispensing of surgical supplies.
The Court of Appeal held that the counting of sponges prior to and following an operation is not a service of a professional nature but merely administrative in character and the performance of an act which required neither special training nor the exercise of professional judgment. To buttress this finding the court relied upon its prior decision in Danks v. Maher, 177 So.2d 412 (1965), where the court, after citing Jordan v. Touro Infirmary, supra, and D'Antoni v. Sara Mayo Hospital, La. App., 144 So.2d 643, quoted from the concurring opinion in Messina v. Societe Francaise de Bienfaissance, La.App., 170 So. 801, 806, and declared:
"In our opinion the counting of laparotomy squares in the instant case was not an act requiring the exercise of a particular skill or discretion acquired or developed by special training. It was an act which could have been done by an unskilled or untrained employee and it did not involve the exercise of any professional judgment. We conclude that the incorrect count was not a medical mistake; it was an administrative or nonprofessional mistake from which liability on the part of the hospital can result."
Adverting to certain evidence in the record given by the nurses involved, to the effect that when they were undergoing training at the hospital they were given instruction relative to sponge counts and that this was part of the course in operating procedures, counsel proclaim the ruling of the Court of Appeal that the sponge counts did not require professional judgment is manifestly incorrect and contrary to the facts in the case.
In ascertaining whether making a sponge count is a nursing service of a professional nature, it is essential to initially determine whether the exclusion from coverage provisions are applicable to all services performed by doctors, interns, nurses or other hospital personnel even though the act is purely of an administrative nature, as counsel for Hardware contend, or whether the exclusion is confined to those services rendered which are strictly of the sort requiring professional skill and judgment. It was well stated by the Court of Appeal in D'Antoni v. Sara Mayo Hospital, supra, in considering the identical exclusion clause here involved, that:
"It seems to us that in determining whether or not a particular act or failure to act is of a professional nature we should look not to the title or the character of the party performing the act but to the act itself. The raising of the side rail was purely a mechanical act which any unskilled person could perform. It certainly requires no professional training or knowledge."
In that case, in which we refused certiorari, the plaintiff sued the hospital and its insurer for personal injuries she sustained as a result of falling from her bed in the hospital, contending that the accident was due to the negligence of the hospital nurse in failing to carry out the doctor's orders in raising the left side rail of her bed from which she fell after oxygen had been administered to her. The insurer of the hospital, as above stated, pleaded the same exclusionary clause as urged herein. But the court rejected the argument, being of the opinion that the failure of the nurse to maintain the side rails of plaintiff's bed in place "* * * was not a `failure to render medical * * * or nursing service or treatment' nor was it `failure to render any service or treatment conducive to health or of a professional nature.'" The court further stated that, "While the initial decision to attach the side *153 rails to the bed may have involved professional judgment, once the attending physician issued the order the professional aspect of it was complete", and the placing and maintaining of the rails in position was purely mechanical.
In our opinion, the Court of Appeal in the D'Antoni case has clearly analyzed and correctly appraised the exclusionary provisions contained in the policy relied on by counsel for Hardware. It is to be noted, as shown by the caption of these provisions, that the parties intended to exclude from coverage only actions for injuries based on malpractice and professional services rendered by physicians, surgeons, nurses and other professional personnel. Accordingly, the exclusions should be interpreted in such manner as to carry out this evident design and, if any of the special exclusionary provisions could be construed broadly to include services extending beyond the announced purpose of the exclusion, such a construction, under familiar principles of law,[3] is to be avoided.
The counting of sponges was not the rendition of a nursing service. Rather, it was a procedure adopted by the hospital and its staff doctors as a safety measure to insure that a sponge would not be left in the body of a patient. Counsel misread the testimony of the nurses when they say that the nurses are instructed with respect to the counting of sponges. The nurses are not instructed in counting. They are instructed in the procedure used by the hospital to prepare and have available sponges in the operating room for use by the surgeon. The simple function of counting the sponges used by the doctor during the operation and also the counting of the number of sponges removed from the patient's body does not convert the mere mechanical counts into a professional service. It cannot be regarded as the rendition of medical or surgical service or treatment; it is not a treatment, and it is neither a service of a professional nature nor the furnishing or dispensing of surgical supplies.[4] The surgeon performing the operation inserts the sponges and this is, of course, a medical treatment to absorb bleeding so that the operation may be performed and, when the surgery is over, it is the surgeon who must remove the sponges before closing the incision.
In essence, we approve the reasoning of the Court of Appeal in Danks v. Maher and in this case and hold that an error made by the nurses in the operating room in the counting of the sponges was an act which was not excluded from coverage by the clause relied on by Hardware in the endorsement attached to its policy of insurance.
The next specification of Hardware, that the Court of Appeal erred in holding that Dr. Golden was not negligent in leaving a surgical sponge in Mrs. Grant's body, has considerable merit in our view.
One of the contentions of Hardware is that Dr. Golden, during the performance of the operation, was in full charge of all the nurses and other medical assistants and, *154 therefore, the doctrine of borrowed employees is applicable. Accordingly, it argued that Dr. Golden was legally responsible for any negligent act of such employees. To support this proposition, Hardware cites Jordan v. Touro Infirmary, supra, wherein it was held that in all matters of operating room procedures the surgeon is responsible and cannot avoid responsibility by delegating part of his function to a nurse.
While it is the general rule that the surgeon is in charge of all personnel in the operating room during the performance of the operation, we do not feel that the evidence justifies the conclusion that, under modern medical operative procedures, it can be said that the borrowed servant doctrine applies in this case. For it is shown by the record that operations performed under modern techniques require team performance, and the nurses and other personnel assisting in the operating room are not at all times under the immediate supervision and control of the operating surgeon so as to bring the case strictly within the "borrowed servant" doctrine. Rather, as stated in Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (1951), it is proper to say that there was a division of control and, in such instances, there is always the presumption that the general employer is liable, and the burden is upon him to show that, with respect to the particular services furnished, "the servant has been lent and is performing only the borrower's work, * * *."
In this matter, while it may be said that Touro relinquished to the physician the right to direct the nurses in attendance in the operating room, it cannot be deduced that it renounced all right of control or that these nurses were responding to the operating surgeon's exclusive control when they made the routine but essential sponge counts prescribed by Touro's board and medical staff.
Apart from this, however, it is our opinion that Dr. Golden was personally negligent. The Court of Appeal correctly stated that it is shown by the record that, every time a sponge is placed by the surgeon in the patient's body, it is attached to a twelve-inch metal holder with which it is handled; "* * * that at no time should the sponge ever be separated from the holder, and that whenever, if it happens, a holder is handed back to one of the nurses and there is no used sponge attached to it, immediately a search is made to locate the sponge which has been disconnected from the holder." Nevertheless, the court resolved that, under these circumstances, "* * * it seems impossible that the doctor could have himself left a sponge in the open abdomen and passed back a holder without a sponge attached to it."
We fail to follow this line of reasoning, as it was not impossible for the doctor to withdraw a holder without a sponge attached to it, and the nurse to receive this holder, without either or both noticing the absence of the sponge. When Dr. Golden was withdrawing the sponges from Mrs. Grant's body, he had the obligation of ascertaining that each holder had a sponge attached. Failure on his part to do so is negligence for, obviously, there was one holder withdrawn from the patient's body that did not have a sponge attached thereto.[5]
The general rule, as stated in 70 C.J.S. Physicians and Surgeons § 48, p. 969, is that a surgeon's failure to remove a sponge or pad before closing an incision may be regarded as negligence per se, and some authorities hold that the surgeon cannot relieve himself from liability for injury to a patient caused by leaving sponges or pads by reliance on a custom or rule requiring *155 the attending nurse to count the sponges or pads used and removed, and on the nurse's statement as to the count.[6]
Albeit there is authority to the contrary, we are convinced that the general rule is sound. While the nurses of Touro were unquestionably negligent in making an incorrect count of the sponges withdrawn from Mrs. Grant's body, which was a proximate cause of the accident, we hold that Dr. Golden was guilty of concurrent fault in failing to notice that one of the holders he withdrew from Mrs. Grant's body did not have a sponge attached. Accordingly, we find Hardware, the insurer of Touro, and Amsterdam, the insurer of Dr. Golden, liable in solido for the damages sustained by the plaintiffs fixed by the jury and approved by the Court of Appeal to be the sum of $18,000.[7]
Finally, we direct attention to Hardware's contention that Touro should not recover from it on the third-party demand the sum of $6,000 which the Court of Appeal awarded as reasonable attorney's fees for the defense of the case. Under Hardware's policy it obligated itself to defend the hospital. Its refusal to do so on the ground that its policy excluded coverage was a breach of contract and, hence, it became liable to Touro for reasonable attorney's fees for the defense of the case. The fact that the principal counsel for Touro candidly testified that he had no agreement with Touro as to fees, and that he did not intend to hold Touro in recompense for his legal services does not, in our opinion, relieve the insurer from responsibility to pay a reasonable fee for the work counsel was required to perform by reason of its default.
For the reasons assigned, the judgment of the Court of Appeal is reversed insofar as it denies plaintiffs' claim against New Amsterdam Casualty Company, and the judgment is now amended so as to run in favor of Mrs. Monty Tyler, wife of/and John F. Grant against Hardware Mutual Casualty Company and New Amsterdam Casualty Company, in solido, for the full sum of $18,000, with legal interest thereon from judicial demand and costs. In all other respects the judgment of the Court of Appeal is affirmed.
HAMITER, J., concurs in part and dissents in part, being of the opinion that the judgment of the Court of Appeal is correct and should be affirmed.
SANDERS, Justice (concurring in part and dissenting in part).
I concur in the resolution of all issues in the majority opinion save one: retention of the charitable immunity doctrine.
In Louisiana, the doctrine of charitable immunity was judicially created. See Jordan v. Touro Infirmary, La.App., 123 So. *156 726 (1922); Jeter, Charitable Institutions: Liability for Tortious Conduct, 17 Tul.L. Rev. 621, 622-625.
As conclusively demonstrated by the doctrinal writers, the doctrine is unsound and has outlived its usefulness. See e. g., Appleman, The Tort Liability of Charitable Institutions, 1936, 22 A.B.A.J. 48; Feezer, The Tort Liability of Charities, 1928, 77 U.Pa.L.Rev. 191; McCaskill, Respondeat Superior as Applied in New York to Quasi-Public and Eleemosynary Institutions, 1920, 5 Corn.L.Q. 409, 6 Corn.L.Q. 56; Spencer, Ray v. Tucson Medical Center: A Reappraisal of Tort Liability of Charities, 1951, 24 Rocky Mt.L.Rev. 51; Notes, 1925, 34 Yale L.J. 316; 1938, 38 Col.L.Rev. 1485; 1938, 48 Yale L.J. 81; 1950, 25 N.Y.U.L. Rev. 612; 1951, 20 U.Cin.L.Rev. 412; 1951, 30 N.C.L.Rev. 67; 1952, 6 Ark.L.Rev. 209; 1953, 32 N.C.L.Rev. 129; 1954, 32 Tex.L. Rev. 376; 1959, 37 N.C.L.Rev. 209; 1957, 19 U.Pitt.L.Rev. 119. In recent years, approximately twenty states have abandoned the doctrine. Prosser, Law of Torts (3rd ed. 1964) § 127, pp. 1023-1024.
In this state, the doctrine has been riddled with exceptions. It has also been rendered unavailable to the insurer of a charitable institution.
From a legal viewpoint, the charitable immunity doctrine clashes with the Louisiana Civil Code. It contravenes the articles making a master liable for the tortious conduct of his servants. See LSA-C.C. Arts. 176, 2315, 2320; Wheeler, The Louisiana Law of Charities, 15 Tul.L.Rev. 177, 216-217; Jeter, Charitable Institutions: Liability for Tortious Conduct, supra, 17 Tul. L.Rev. 623.
Since the courts established the doctrine, this Court can now repudiate it. I would do so for the betterment of the law.
For the reasons assigned, I concur in part and dissent only from the retention of the charitable immunity doctrine in Louisiana.
BARHAM, Justice (Concurring in Part and Dissenting in Part).
The majority, citing only Court of Appeal cases and apparently relying entirely upon them, has decided that the law of Louisiana makes eleemosynary institutions immune from liability for the delicts of their servants. The majority cites no constitutional, codal, or statutory authority or Supreme Court jurisprudence for such law, but states nevertheless that "* * * if any change is to be effected in the law, it should be made by the legislative and not the judicial department". I believe that Civil Code Articles 2315, 2316, and 2320, which assign responsibility to respond in damages for one's fault or for the fault of certain others,[1] govern, and that therefore the law of Louisiana is clear and contrary to the majority holding. The law being express, the Court of Appeal could not resort to a determination based upon equity under Civil Code Article 21.[2]
There is no foundation in civil law for the doctrine of charitable immunity as pronounced by the cited Court of Appeal cases and in certain common law states. So far as I have been able to ascertain, the doctrine *157 is not accepted in any foreign jurisdiction, civilian or common law, and though once perhaps a majority view in the United States, it is now a fast waning and dwindling minority theory. It had an inauspicious and not too reputable beginning in the United States in a case arising in Massachusetts in 1876, McDonald v. Massachusetts General Hospital, 120 Mass. 432, 10 years after the repudiation of the doctrine in England.[3] Although the doctrine has been embodied into law in many states, voluminous opinions in the various jurisdictions have vainly attempted to find a logical rationale for it.
While it should be sufficient to state that the doctrine of charitable immunity is not the law in the State of Louisiana, there being express codal provisions to the contrary and no statutory authority or Supreme Court jurisprudence to support the exception from liability, it may be interesting and perhaps worthwhile to note the "origin and growth" of the doctrine in Louisiana.
In two early cases involving lumber companies which collected dues or fees from their employees to secure medical care for these employees, this court considered a master-servant relationship of the doctor to the company.[4] Although language and common law citations from these cases are cited by later appellate decisions, neither of these cases is authority for the doctrine of charitable immunity in Louisiana.
The existence of the doctrine in Louisiana, according to the appellate jurisprudence, rests upon the 1922 case of Jordan v. Touro Infirmary, 123 So. 726 (La.App.Orl.). If this be so, the doctrine is as stable as an inverted pyramid of large stones resting upon a single pebble. The Jordan case, attempting to absolve from liability the same defendant as in the instant case (then itself an "indigent" hospital for the indigent), first gives a statement of facts from which it is difficult if not impossible to find the negligence required in malpractice suits. Then, after a discussion of the master-servant doctrine, it concludes that the nurses, including the one alleged to be negligent, were not servants of the hospital but were to be considered "* * * pro hac vice, as the servants of the surgeon". After this positive legal holding and an irrelevant discussion of common law holdings on charitable immunity, that case states in dictum that a charitable hospital cannot be held responsible for the negligence of its nurses.
The majority has indicated that our refusal of certiorari has "* * * inferentially, if not directly, * * * sanctioned the doctrine * * *". In Jordan v. Touro, supra, we refused writs with the comment: "The decree is correct." There are few weaker affirmations of appellate decisions, for such a refused adopts no language, reasoning, or law in the case, but sanctions only the decree. That decree can be supported by the factual statement and the court's holding that the nurses were the servants of the surgeon.
A number of later cases, all in the Courts of Appeal, often in dicta, found authority in Jordan for charitable immunity.[5] While *158 our Courts of Appeal have attempted to create charitable immunity out of dictum, common law, and disregard for positive codal provisions, this court has never, by inference or otherwise, adopted this doctrine.[6] The refusal of writs by this court which is usually based upon incomplete records and ex parte applications and without hearing, is not decisional law. This court's action upon writs may be indicative of a predisposition on a certain legal issue but is not necessarily determinative of that issue. I will not, and this court should not, be bound by its refusal of writs to adopt law expressed in appellate court opinions, although we may well adopt such a case holding as law when, upon a full hearing, we find it supported by positive law, or, in the absence of positive law, supported by reason and logic or natural law.
In the states which still retain the charitable immunity or "trust fund" doctrine or vestiges of it, jurisprudence advances what appears to me to be illogical and irrational theories for the invoking of such an exception to the usual application of vicarious liability. Our Courts of Appeal, in an attempt to find some philosophy for the doctrine, have vacillated between such theories as "trust fund", public policy, quasi-governmental functions, and waiver. Charitable immunity, although apparently created as a public policy to encourage charities, actually violates the general public policy because it affords great protection to trust funds and certain other properties, thus favoring property rights over personal rights.
The doctrine in Louisiana and in these other states has been mutated, warped, and excepted from so that there is no semblance of uniformity or consistency in the extent and nature of the immunity granted eleemosynary institutions. In Louisiana it has been held in these appellate court decisions that paying recipients of services and nonpaying recipients of services are equally without remedy, but that third parties, visitors, licensees, and in general all those who do not pay for the services of, or receive charity from, the institutions are not affected by this limitation. Thus, ridiculously and ironically, upon registering and entering a so-called "charitable" institution, one is at the mercy of the negligent employees of that institution, though one pays reasonable or even exorbitant fees for services; yet after discharge, if one slips and falls between the discharge desk and the exit due to an employee's negligence, he is allowed to recover fully for his damages. Or perhaps I have overstated the possible future application and the "charitable" institution will be liable for injuries occurring only after one has left the premises, as, for example; if a vehicle owned by that institution and driven by its employee negligently strikes and injures him.
The writers in Louisiana have uniformly criticized the Court of Appeal decisions *159 which have grafted the erroneous common law doctrine onto our express and well defined law governing responsibility in this area.[7] It may be safely said that the overwhelming view of all of the authorities and writers rejects the doctrine as being unsound in theory and in application. As in many other common law states, in 1951 the Supreme Court of Mississippi overruled prior decisions and repudiated the doctrine in the well reasoned landmark case of Mississippi Baptist Hospital v. Holmes, 214 Miss. 906, 55 So.2d 142, 56 So.2d 709, 25 A.L.R.2d 12.[8]
In a civilian jurisdiction such as ours, where we are bound to follow the positive law, decisional law should not supplant legislative or constitutional authority. However, when decisions are pronounced by the highest court of this state and property rights are vested or the pronouncement has been repeated or relied upon so as to become "jurisprudence constante", these decisions carry great weight and are most often determinative of similar issues. As previously noted, the express relevant law is contained in our Civil Code, and would reject the theory of charitable immunity. We must not fall into error because of prior Court of Appeal cases which have attempted to establish law contrary to the Code. This is a case of first instance for us, and it is not only our prerogative, it is our mandate to determine it as res nova. This is a judicial and not a legislative responsibility. If we discharge our responsibility and follow the law, we are bound to declare that the defendant Touro Infirmary is liable for the negligence of its servants who were acting within the course of their employment.
I must dissent also from the majority holding that Hardware Mutual Casualty Company is liable under its general liability insurance policy covering Touro. The exclusionary clause which must relieve the company from responsibility is:

"Exclusion of Malpractice and Professional Services

"1It is agreed that as respect any classification stated below, the policy does not apply to injury, sickness, disease, death or destruction due to
"AThe rendering of or failure to render

"1Medical, surgical, dental, x-ray or nursing service or treatment, or the furnishing of food or beverages in connection therewith:
"2Any service or treatment conducive to health or of a professional nature; or
"3Any cosmetic or tonsorial service or treatment;
"BThe furnishing or dispensing of drugs or medical, dental, or surgical supplies or appliances; or
"CThe handling of or performing of autopsies on dead bodies." (Emphasis supplied.)
I have read the majority opinion carefully and note its reliance upon the same Court of Appeal cases which created "charitable immunity" for support in interpreting this clause in a manner that imposes liability upon the hospital's insurer. The majority has finally concluded that the services of specially trained surgical nurses on duty in an operating room during abdominal surgery are not professional or nursing services. If the majority can show me that this record supports this finding, or that it is the practice of any reputable hospital to allow the use of a "non-professional" staff in rendering the services which the nurses in the instant case performed, I will gladly concur in its result. *160 The conclusion is inescapable that the services here rendered were "medical, surgical", "or nursing service or treatment" "conducive to health or of a professional nature".
I agree that the surgeon is either negligent or vicariously responsible, and that New Amsterdam Casualty Company, the surgeon's insurer, is liable; but I find, contrary to the majority, that Touro is solidarily bound with this other defendant for the fault of the nurses as its servants also. I would, however, dismiss Hardware Mutual Casualty Company from the suit under the clear and unambiguous exclusionary clause in its liability insurance policy.
I therefore concur in part, and respectfully dissent in part.
SUMMERS, Justice (dissenting in part and concurring in part).
I join in the reasons assigned by Mr. Justice Barham.
SANDERS, SUMMERS and BARHAM, JJ., dissent from the refusal of a rehearing.
NOTES
[1] Hardware's motion for summary judgment was sustained by the district court, but its ruling was reversed by the Court of Appeal. That court remanded the matter for the hearing of evidence holding that the issue whether coverage was excluded under the policy was one of fact. See Grant v. Touro Infirmary, La. App., 169 So.2d 574.
[2] Indeed, Touro fits exactly within the definition of a public charitable institution as stated in 15 Am.Jur.2d, Charities, Sec. 148, p. 156, which describes such institutions to be:

"A corporation the object of which is to provide a general hospital for sick persons, having no capital stock or provision for making dividends or profits, deriving its funds mainly from public and private charity and holding them in trust for the object of sustaining the hospital, and conducting its affairs for the purpose of administering to the comfort of the sick, without expectation or right on the part of those immediately interested in the corporation to receive compensation for their own benefit, is a public charitable institution."
[3] Articles 1945, 1946, 1948, 1955 and 1957, Civil Code; Corporation of Roman Catholic Church of Eunice v. Royal Ins. Co., 158 La. 601, 104 So. 383; Albritton v. Fireman's Fund Ins. Co., 224 La. 522, 70 So.2d 111 and cases there cited.
[4] In addition to the rulings of the Fourth Circuit Court of Appeal in D'Antoni v. Sara Mayo Hospital and Danks v. Maher, 40 Am.Jur.2d, Hospitals and Asylums, Sec. 29, pp. 872 and 873, states:

"A hospital is liable for the negligence of its nurses in performing mere administrative or clerical acts that, though constituting a part of the treatment prescribed by a physician or surgeon, do not require the application of his specialized technique or understanding."
It has also been held in other jurisdictions that a sponge count is a mere administrative act. See Buzan v. Mercy Hospital, Inc., (Fla.App.) 203 So.2d 11; Rural Educational Asso. v. Bush, 42 Tenn.App. 34, 298 S.W.2d 761; and French v. Fischer, 50 Tenn.App. 587, 362 S.W.2d 926.
[5] In this connection, it is well stated by the dissenting judge:

"While the surgeon cannot be required to keep a count record of sponges used and removed, he is bound to notice the absence of the sponge if a holder which is removed has no sponge attached. The failure to notice this evidences actual negligence on the part of the surgeon. * * *" See 207 So. 2d at page 244.
[6] See Ales v. Ryan, 8 Cal.2d 82, 64 P.2d 409; Key v. Caldwell, 39 Cal.App.2d 698, 104 P.2d 87; Davis v. Kerr, 239 Pa. 351, 86 A. 1007, 46 L.R.A.,N.S., 611; Barnett's Adm'r. v. Brand, 165 Ky. 616, 177 S.W. 461; Spears v. McKinnon, 168 Ark. 357, 270 S.W. 524; Walker v. Holbrook, 130 Minn. 106, 153 N.W. 305; Paro v. Carter, 177 Wis. 121, 188 N.W. 68; Ault v. Hall, 119 Ohio St. 422, 164 N.E. 518, 60 A.L.R. 128; Funk v. Bonham, 204 Ind. 170, 183 N.E. 312; Palmer v. Humiston, 87 Ohio St. 401, 101 N.E. 283, 45 L.R.A.,N.S., 640; Armstrong v. Wallace, 8 Cal.App.2d 429, 47 P.2d 740; Rule v. Cheeseman, 181 Kan. 957, 317 P.2d 472; Winchester v. Chabut, 321 Mich. 114, 32 N.W.2d 358; Jackson v. Hansard, 45 Wyo. 201, 17 P. 2d 659; Stawicki v. Kelley, 113 N.J.Law 551, 174 A. 896, aff'd 115 N.J.Law 190, 178 A. 754; McCormick v. Jones, 152 Wash. 508, 278 P. 181, 65 A.L.R. 1019; and French v. Fischer, 50 Tenn.App. 587, 362 S.W.2d 926.
[7] We observe that Amsterdam alternatively contends that, should we find Dr. Golden exercised a measure of control over Tuoro's nurses, then it is entitled to full indemnity against Touro and Hardware on its third-party demand as Dr. Golden was only passively or constructively at fault. Since we find Dr. Golden personally negligent, there is no merit in the claim.
[1] These articles read:

"Art. 2315. Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
"* * *"
"Art. 2316. Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."
"Art. 2320. Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
"* * *"
[2] Article 21 provides: "In all civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent." (Emphasis supplied.)
[3] An English case, Heriot's Hospital v. Ross, 12 Clark & F. 507, 8 Eng.Reprint 1508 (1846), espoused a "trust fund" doctrine in dictum, which was followed by several cases until repudiated 20 years later in Mersey Docks v. Gibbs, 11 H.L. Cas. 686, 11 Eng.Reprint 1500 (1866).
[4] Nations v. Ludington, Wells & Van Schaick Lumber Co., 133 La. 657, 63 So. 257, 48 L.R.A.,N.S., 531 (1913); Congdon v. Louisiana Sawmill Co., Ltd., 143 La. 209, 78 So. 470 (1918).
[5] Demien v. Y.M.C.A., 5 Peltier's Orl.App. 11 (1922); Foye v. St. Francis Sanitarium, 2 La.App. 305 (2nd Cir. 1925) (dictum); Thibodaux v. Sisters of Charity, 11 La.App. 423, 123 So. 466 (2nd Cir. 1929) (amazingly applying the rule of stare decisis); Bougon v. Volunteers of America, 151 So. 797 (La.App.Orl.1934) (dictum); Messina v. Societe Francaise de Bienfaissance, etc., 170 So. 801 (La. App.Orl.1936) (dictum); Jurjevich v. Hotel Dieu, 11 So.2d 632 (La.App.Orl. 1943) (which, after finding the doctrine firmly established, theorizes that "* * * to the extent that such institutions administer to the indigent sick, they are discharging governmental functions * * *"); D'Antoni v. Sara Mayo Hospital, 144 So.2d 643 (La.App.4th Cir. 1962); Hill v. Eye, Ear, Nose & Throat Hospital, 200 So.2d 34 (La.App. 4th Cir. 1967) (wherein it should be noted that without any finding or reference to charitable services the court concludes that "* * * hospitals are regarded as charitable organizations entitled to immunity from suit"). But see Stanley v. Schumpert, 117 La. 255, 41 So. 565, 6 L.R.A.,N.S., 306 (1906), wherein this Supreme Court specifically held a hospital liable and responsible for the negligence of a nurse who applied alcohol to the patient's eye instead of the proper solution. Danks v. Maher, 177 So.2d 412 (La.App.4th Cir. 1965), seems to rationalize that the Supreme Court case of Stanley v. Schumpert, which never considered charitable immunity, was differentiating between administrative and professional acts of the nurses, and that case relied upon Stanley as a basis for its holdings. Finally, see Humphreys v. McComiskey, 159 So.2d 380 (La.App.4th Cir. 1964).
[6] Writs have been applied for and considered only in the Jordan, Messina, D'Antoni, and Jurjevich cases. In each of these a qualified denial of writs was made.
[7] 17 Tulane L.Rev. 621, an excellent comment by Robert McLean Jeter, Jr.; 26 Tulane L.Rev. 396; 32 Tulane L.Rev. 138.
[8] See complete discussion in that case, and the Annotation in 25 A.L.R.2d at pp. 29 et seq.